IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

GRANT HAMRICK,

    PLAINTIFF,

v.                                           No. 3:20-cv-00417-TRM-dcp
                                             JURY DEMAND

SPLASH TRANSPORT, INC.,
AHMED ELMEHALAWY,
NANDLEEN, LLC d/b/a NANDLEEN
LOGISTICS, and
REGINALD DEVON JAMES

    DEFENDANTS.
_____/

## PLAINTIFF GRANT HAMRICK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SANCTIONS AGAINST DEFENDANTS NANDLEEN, LLC AND REGINALD DEVON JAMES

This motion presents the Court with the following issues:

    The dispute is whether Nandleen, LLC's truck driver parked his big rig on the highway shoulder for a medical emergency **or** to call his boss to see if he could skip his Miami trip to go home to North Carolina. Nandleen, LLC's owner communicated multiple times with the truck driver about this trip on the day of the crash and those text messages are relevant to the purpose of the parking. When litigation is reasonably anticipated parties must instruct employees to identify and **preserve all relevant information, including text messages**. Nandleen, LLC's owner and its (only) driver sent/received text messages **about this trip** on the day of the crash. Despite having received formal preservation letters, Nandleen, LLC did not produce and destroyed these messages. This Court should impose appropriate sanctions, including issuing an adverse inference jury instruction and/or other relief.

## I. FACTS AND BACKGROUND

### a. Nandleen, LLC's custom and practice of truck driver cell-phone use on trips.

Every witness in the cause with knowledge of commercial trucking has or will admit that parking eighteen-wheelers on the highway shoulder for non-emergencies is prohibited by trucking companies that instill this rule in drivers. Here, a **critical** factual dispute exists as to the reason **why** Nandleen, LLC driver Reginald James parked the eighteen-wheeler truck in this spot. Nandleen, LLC claims its driver parked because of a "medical emergency." Reginald James, however, testified that he parked at the intersection where one highway would have taken him to his assigned delivery destination in Miami and the other would take him home to visit his family. Reginald James testified while parked he called his boss to ask permission to drive home over 400 miles to North Carolina. The text messaging between Nandleen, LLC and Reginald James would likely determine the purpose of the parking. Nandleen, LLC failed to preserve or produce those text messages. This Court should impose sanctions.

Nandleen, LLC's owner, Ailende Omozokpea, admits that he communicated with Reginald James during this trip with text messaging on their cellular phones. Yet, despite having received a formal request for preservation, Nandleen failed to preserve those text messages and destroyed the cellular phone he sent and received those messages on.

Nandleen is a motor carrier (trucking company) that dispatches drivers in eighteen wheelers to haul cargo nationwide. In order to communicate and receive information related to cargo shipments with its drivers, Nandleen's custom and

practice was to use text messaging and cellular phones to send and receive information to and from drivers when those drivers were under dispatch. Plaintiff sought to obtain these messages in discovery because several text messages were sent to and from Nandleen, LLC's owner, Ailende Omozokpea, and Reginald James at key times the day of the crash that makes the basis of Plaintiff's claims.

On trips, Nandleen, LLC's truck driver(s) communicate with the Nandleen, LLC owner via cell-phone text messages about the trip details. This practice includes sending documents like bills of lading, the location for pick-up and delivery, and confirmation details of the cargo load to and from the owner to the driver.

Explaining how he came to be parked, Reginald James testified:

> Q. And then you -- and then you eventually
> 6 got down to Knoxville.
> 7 Was -- was it your intent to go through
> 8 Knoxville on the rest of the way to get down to
> 9 Miami?
> 10 A. I'm not too sure what my intent was.
> 11 No, no, wait. Well, I know I wasn't going
> 12 to make Miami that night, so you just kind of find a
> 13 way, what you -- you don't really know until you
> 14 don't have no time left, and you're getting close to
> 15 your time.
> 16 So as -- when I got to Knoxville, getting
> 17 close to it, that's when I started feeling, you
> 18 know, sick. So -- so at that point, I'm thinking,
> 19 you know, maybe I -- **maybe I should just go home,**
> **20 you know. I don't know if it was just a stomachache**
> **21 or, you know, maybe I just needed to go home, you**
> **22 know, catch a load off, you know**. So I wasn't
> 23 too -- I wasn't -- my intentions was not to get to
> 24 Miami, no, with -- you know, that same day.

(**Exhibit 3**, Deposition of Reginald James, p. 98, lines 5 – 24) (emphasis added).

3

Nandleen, LLC through its designated representative Ailende Omozokpea confirmed that he did send and receive text message to and from Reginald James about delivery of the cargo and trip that forms the basis of the claims in this cause:

> Q. Did you or Reginald James text message or
> 5 send any documents back and forth that would have
> 6 occurred regarding this particular load that he was
> 7 picking up at Hayneedle in Lebanon, Ohio?
> 8 A. Yeah. I think I actually -- I don't
> 9 remember how I sent him the -- that should be how I
> 10 sent him the -- the location of the first place. I
> 11 have to text him, like, a screenshot of the bill of
> 12 lading and say this where you're going, and this is
> 13 where you're delivering. So I think that's how it
> 14 is.
> 15 Q. Because I -- I've also asked for the bill
> 16 of lading, and I was not produced any bill of
> 17 lading. Where is the bill of lading?
> 18 A. I should have a copy of the bill of
> 19 lading, right?
> 20 Q. Okay. So let's do this. So the
> 21 next-numbered exhibit, which will be late-filed,
> 22 which will be all the text messages between you and
> 23 Reginald James that you're going to look for, which
> 24 will be 19, late-filed exhibit. Okay?

(**Exhibit 2**, Deposition of Ailende Omozokpea, p. 164, lines 4 – 24). As for whether Nandleen, LLC preserved the requested information, Ailende Omozokpea testified that **he did a factory reset to the phone essentially wiping out all the data** and "doesn't remember" who he sent the phone to:

> 20 Q. And the last question I have is the cell
> 21 phone that -- that Mr. James called you on, what is
> 22 the phone to that?
> 23 A. My phone number?
> 24 Q. Well, the one that he called you on. Did
> 1 he call you on your cell phone, or did he --
> 2 A. Yes.

(**Exhibit 2,** Deposition of Ailende Omozokpea, p. 157, line 20 – p. 158, line 2).

> Q. Do you still have the phone that you were

4

20 using when Mr. Reginald James called you?
21 A. No, I don't think so.
22 Q. Did you get rid of it?
23 A. Yes, I think so.
24 Q. What -- what did you do with it?

A. Normally, I give it out. I don't -- I
2 don't sell my phones. I'll just gift it to someone.
3 So I send it back to my country.
4 Q. Okay. Do you know who you sent it to?
5 A. I can't remember.
6 Q. You give it to someone you know or to a
7 stranger?
8 A. Oh, someone I know, for sure.
9 Q. Okay. I would like you to figure out who
10 you sent that to because there may be material
11 information on that. Can you agree to do that?
12 A. I'll figure out. But I reset the phone
13 before I sent. I only save some few stuff, you
14 know, that I feel is useful to my new phone, and I
15 just factory reset the old thing so I can give it
16 up.
**17 Q. Did you delete the data, the call data and**
**18 text messaging on it?**
**19 A. I factory reset the phone to brand-new.**
**20 Yes.**
21 Q. So yes. Okay.
22 Do you back up the information to the
23 cloud?
24 A. Some. Like some photos and other stuff

1 should be.
2 Q. Okay. Did you back up text messaging or
3 voicemails or anything like that to the cloud?
4 A. Maybe text message, but voicemail, I
5 don't -- I don't think so.
6 Q. Do you ever communicate with drivers
7 through text messaging or through any kind of app?
8 A. I do, through text messaging.
9 Q. Okay. Is that the -- is that the text
10 messaging app on the iPhone that comes as a default
11 text messaging app?
12 A. Yes.
13 Q. Yes.
14 Okay. Have you -- did you ever
15 communicate at any time with Reginald James between
16 the time that he was hired and the time that the

5

17 crash happened on text messaging on the iPhone?
18 A. Yeah. We should do it a few times because
19 normally, he send me bill of lading, proof of
20 delivery. He normally send them to me through text
21 message (indiscernible).
22 (WHEREUPON, THE STENOGRAPHER REQUESTS
23 CLARIFICATION.)
24 A. He takes photo of the bill of ladings and

1 send to me; he does that.
2 BY MR. WRIGHT:
3 Q. Did you do anything to try to preserve
4 those messages to and from Reginald --
5 A. Yes.
6 Q. You did?
7 A. Yes.
8 Q. Okay. Where are they?
9 A. I will check if I have them on my phone,
10 because when I change phone, like I said, I use
11 iCloud to bring everything back. So probably I
12 obviously have some.
13 Q. Okay. I had a little trouble
14 understanding you. You can check back, and you
15 think you may have some; is that what you said?
16 A. Yes, possible.
17 Q. Okay. Where would you look to find those?
18 A. I would check my computer because I tried
19 to do backup on my MacBook, but I don't know if I
20 did it correctly. But I've not seen those
21 information after that. But if not, I'll check my
22 MacBook, and I will also check my phones.
23 Q. Okay. And I would like you to produce any
24 and all electronic communications between you and

1 Reginald James that would have occurred between the
2 time that he was hired and the time that he was
3 terminated. Okay? Can you do that?
4 A. Okay. He wasn't terminated, though, but
5 the time he left, yes.
6 Q. Fair enough. I know -- that was unfair of
7 me to say that, and I didn't mean -- I didn't intend

8 to say that you fired him. But he was -- his
9 employment terminated for whatever reason.
10 He left of his own accord, correct?
11 A. Yes.
12 I cannot guarantee those document, but I

6

13 will search. I don't know as -- if I have them
14 firsthand.
15 Q. So you -- you believe that you -- you
16 saved these possibly backed up on your MacBook
17 laptop computer, correct?
18 A. Possibly, but I'm not guaranteeing.
19 Q. Okay. But you remember trying to do that
20 at some point?
21 A. I -- yeah, I know I always back up -- try
22 to back up my phone before I reset, but, you know,
23 stuff come backs anyway when you -- when you put it
24 in your iCloud, so . . .

(**Exhibit 2**, Deposition of Ailende Omozokpea, p. 159, line 19 – p. 163, line 24).

### b. **Nandleen, LLC has failed to preserve or produce the critical text messages.**

Nandleen, LLC was sent and received at its office address a Request for Preservation dated September 17th, 2021 (**Exhibit 4**) which put Nandleen, LLC on notice to preserve all evidence that may be relevant to future litigation. (See **Exhibit 1**, Declaration of Matthew E. Wright). This Request for Preservation specifically sought preservation of all records from the date of the crash and seven (7) days prior of all "**Bills of Lading**," "**Dispatch Records**," "**Driver call-in records**," "**Any and all cellular and telephone records and bills of Devon Reginald for the day of the motor vehicle crash with Grant Hamrick and seven (7) days prior**," "[a]ny and all satellite communications and email for the day of the collision," **"[t]he cellular phone records from Devon James for the day of the collision**," "data and devices – all data from the actual devices from…messaging systems…"

7

Another Request for Preservation was sent to Devon J. Reginald[1] dated September 21st, 2020 **(Exhibit 5)** to preserve "**All electronic devices that were in your possession and/or control including but not limited to all cellular phones, tablets, laptop computers, messaging systems and/or other electronic communication systems**" and "**All data, including data contained in the cloud or back-up device for July 27th, 2020 and the prior thirty (30) days**."

During the course of litigation, Plaintiff served Requests for Production on Nandleen, LLC that sought production of all "electronic mobile communications records through fleet management systems," "all cellular and telephone records of REGINALD JAMES for the day of the collision with Plaintiff and seven (7) days prior" "dispatch records."

Nandleen, LLC was asked to produce all cellular phone records from Reginald James for day of the collision and responded, "Defendant is not in possession of any documents responsive to this discovery request" and for the trip at issue to produce all "bills of lading," "dispatch records," "electronic mobile communication records through fleet management and responded that "Defendant is not in possession of any documents responsive to this discovery request."

Through written discovery, Nandleen, LLC never identified **any** electronic message or other communication, message records, or similar nor preserved nor produced these material records. It was only during the Fed. R. Civ. P. 30(b)(6) deposition of Nandleen, LLC that Plaintiff learned not only did Nandleen, LLC

---

[1] The Request for Preservation was sent to the name and address listed in the subject Traffic Crash Report. The correct name of the Defendant was determined thereafter.

8

routinely communicate with drivers through cell phones and electronic text messages, Nandleen, LLC **communicated multiple times with Reginald James about the trip in question**. These messages are material evidence relevant to the key dispute at issue: the purpose of why Reginald James parked on the highway and called his boss.

To date, Nandleen, LLC has never produced a single text message sent or received for the day the crash and surrounding it.

Nandleen, LLC reasonably anticipated litigation at the instant the crash occurred, as evidenced by the fact that the Nandleen, LLC owner instructed Reginald James to take video and photos of the scene of the crash. (**Exhibit 2**, Deposition of Ailende Omozokpea, p. 62, lines 11-21) and, thereafter, both Nandleen, LLC and Reginald James received separate Requests for Preservation (**Exhibit 4** and **Exhibit 5**). Plaintiff's Counsel made follow up requests to obtain this information that was to be marked as late-filed exhibits and these Nandleen Defendants have never produced the information. (See **Exhibit 1**, Declaration of Matthew Wright; **Exhibit 6**, October 1, 2021 and October 19, 2021 email to counsel for Nandleen, LLC and Reginald James).

## LAW AND ARGUMENT

### c. Nandleen, LLC and Counsel had a duty to preserve and produce the text messages at issue.

Nandleen, LLC **admits** it is improper for a professional truck driver to park an eighteen wheeler on the side of the highway for any other reason other than an emergency situation. (**Exhibit 2**, Deposition of Ailende Omozokpea p. 23, line 20 – p. 24, line 10). Reginald James further describes how he had received training never to

9

park on the side of highways because of the hazard doing so created. (**Exhibit 3**, Deposition of Reginald James, p. 28, lines 9-21). Nandleen, LLC and Reginald James continue to insist that Reginald James experienced a "medical emergency" and, therefore it was proper for Reginald James. This information is solely under the control of Nandleen, LLC and its key players and Nandleen failed to preserve it.

A party has a duty to preserve relevant information including electronically stored information when that party "has notice that the evidence is relevant to the litigation or…should have known the evidence may be relevant to the future litigation. John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008)(citing with approval, Fujitisu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001); see also, Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 216-18 (S.D.N.Y 2003); The Sedona Principles: Best Practices and Recommendations & Principles for Addressing Electronic Document Production, Second Edition 11, 28 (The Sedona Conference Working Group Series, 2007), available at https://thesedonaconference.org/sites/default/files/publications/The%20Sedona%20Principles%20Third%20Edition.19TSCJ1.pdf.

Courts have repeatedly found that employers have control over their employees and can be required to produce documents in their employees' possession. See, e.g., Caston v. Hoaglin, No. 2:08-CV-200, 2009 U.S. Dist. LEXIS 49591, 2009 WL 1687927, at *3 (S.D. Ohio June 12, 2009) (holding an employer "has control over its current employees and the records within their possession") (citing In re Grand Jury Subpoenas Duces Tecum Dated June 13, 1983 and June 22, 1983, 722 F.2d 981, 984 (2d Cir. 1983)); Miniace v. Pacific Martime Association, No. C 04-03506, 2006 U.S. Dist. LEXIS 17127, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006)

10

("Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession." (citing Herbst v. Able, 63 F.R.D. 135, 138 (S.D.N.Y. 1972) and Riddell Sports, Inc. v. Brooks, 158 F.R.D. 555, 558-59 (S.D.N.Y. 1994)); Schaaf v. SmithKline Beecham Corp., 233 F.R.D. 451, 455 (E.D.N.C. 2005) (finding employer had control over employee's work-related documents, whether located at office or in her home (citing In re Grand Jury Subpoenas, 722 F.2d at 984)). Discovery is expected to seek documents even from former employees. See 8B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure § 2210; Export-Import Bank of the United States, 233 F.R.D. at 341 ("[C]ourts insist that corporations, at the very least, ask their former employees to cooperate before asserting that they have no control over documents in the former employees' possession."). Chevron Corp. v. Salazar, 275 F.R.D. 437, 448-49 (S.D.N.Y. 2011). Indeed, courts have found that even a personal "gmail" account of an individual employee falls under the proper scope of production. Chevron Corp, 275 F.R.D. at 448-49.

This duty to preserve material evidence extends to the period before litigation commences when a party reasonably should know that the evidence *may* be relevant to the anticipated litigation. Clark Const. Grp., Inc. v. City of Memphis, 229 F.R.D. 131, 136 (W.D. Tenn. 2005)(emphasis added). The scope of the duty to preserve evidence extends to "those employees likely to have relevant information (the "key players" in the litigation)." Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 218 (S.D. N.Y. 2003).

Once a litigation hold is in place, a party and their counsel must make certain "all sources of potentially relevant information are identified and placed on hold" and communicate with the key players in the litigation to understand how they stored information. John B. v. Goetz, 879 F.Supp.2d 787, 870 (M.D. Tenn. 2010) (citing, Zubulake, 229 F.R.D. at 432-34). The hold should be re-issued including direct communications to the key players of the duty to preserve evidence. John B. Goetz, 879 F.Supp.2d at 871 (citing, Zubulake, 229 F.R.D. at 432-34). The litigation hold should instruct all employees to produce electronic copies of their relevant files and to make sure that all backup media is identified and stored in a safe place and "[o]nce on notice, the obligation to preserve evidence first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation." Goetz, 787 F.Supp.2d at 868 (citing with approval, Telecom International Am. Ltd. v. AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999)(citing, Kansas-Nebraska Natural Gas Co., v. Marathon Oil Co., 109 F.R.D. 12, 18 (D. Neb. 1983). Neither a preservation demand letter nor a court order is required. Goetz, 879 F.Supp.2d at 868 (citing, Wiginton v. Ellis, 2003 U.S. Dist. 19128, 2003 W.L. 22439865 at **4,5 (N.D. Ill. 2003)). Courts have repeatedly found that employers have control over their employees and can be required to produce documents in their employees' possession." Chevron Corp. v. Salzar, 275 F.R.D. 437, 448-449 (S.D.N.Y 2011); 7 Moore's Federal Practice – Civil § 34.14 (Matthew Bender 3d Ed.). Employers are deemed to have control over employees' work-related documents, regardless of whether those documents are located at home or at the office. Schaaf v. SmithKline Beecham Corp., 233 F.R.D. 451, 455 (E.D.N.C. 2005).

According to a leading treatise, as for what constitutes "custody" and "control," legal ownership is not determinative and courts consider:

- The use or purpose to which the materials were employed.
- Whether the materials were generated, acquired, or maintained with the party's assets.
- Whether the party actually generated, acquired, or maintained the materials.
- Whether the party determined the materials' use, location, possession, or access.
- Who actually had access to and use of the materials.
- The extent to which the materials serve the party's interests.
- Any formal or informal evidence of a transfer of ownership or title.
- The ability of the party to the action to obtain the documents when it wants them.
- Whether and to what degree the nonparty will receive the benefits of any award in the case.
- The nonparty's connection to the transaction at issue.

7 Moore's Federal Practice - Civil § 34.14 (2)(b)(Matthew Bender 2020).

Thus, electronic text messages that were created by company employees for a company purpose fall under the definition of records under the "control" of a party and necessitates the obligation to identify and preserve those records at the instant litigation is reasonably anticipated.

As set forth above, Nandleen, LLC's custom and practice was for the Nandleen truck driver(s) to communicate to the owner via cellular phone and text messages regarding all the aspects of the cargo delivery and trip. Nandleen, LLC and its driver Reginald James unequivocally admitted to having communicated about this trip in question. The texts undeniably were generated using Nandleen, LLC owner's cell phone (which he destroyed and failed to preserve the messages). For these texts, management had actual knowledge about them, and sent and received them. The texts were under the exclusive control of Nandleen, LLC's owner and its driver.

> d. **Because Nandleen, LLC did not take any steps to preserve and did not produce this material evidence, this Court should instruct the jury that it must presume the information was unfavorable to Nandleen, LLC.**

Rule 37 of the Federal Rules of Civil Procedure provides for imposition of sanctions. Pursuant to Fed. R. Civ. P. 37, a court is authorized to impose sanctions when a party fails to cooperate in discovery and/or obey a discovery order. Grange Mut. Cas. Co. v. Mack, 270 F.App'x 372, 376 (6th Cir. 2008)("A district judge holds a variety of sanctions in his or her arsenal"). A court can also exercise its inherent powers to enter sanctions against a party due to spoliation of evidence. Adkins v. Wolever, 554 F.3d 650, 653 (6th Cir. 2009); see also, Residential Funding Corp. v. DeGeorge Finanial Corp., 306 F.3d 99, 107 (2d Cir. 2002)(holding that where "the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction"). Specifically regarding ESI, Rule 37(e) of the Federal Rules of Civil Procedure provides:

14

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> **(A)** presume that the lost information was unfavorable to the party;
> **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
> **(C)** dismiss the action or enter a default judgment.

(Federal Rule of Civil Procedure 37(e)). The Court can and should make a finding that Nandleen, LLC intended to deprive Trimboli of the information's use that is contained in the text messages that were sent, because they were between both the owner Ailende Omozokpea and Nandleen, LLC driver Reginald James regarding every detail of the trip to be driven by James from Ohio to Miami and with his intention to divert to drive home to North Carolina.

Despite actual knowledge of Nandleen, LLC and its driver both of whom sent and received text messages to and from each other throughout the day of the crash and spoke with each other. Nandleen, LLC gave this response to a clear question that sought as late filed exhibit and through other requests for production and prior requests for production, outlined above. The appropriate sanction should be a jury instruction that the jury must presume the texts would have been unfavorable to Nandleen, LLC, because Nandleen, LLC destroyed the text messages.

## II.  CONCLUSION

Discovery has unquestionably established those texts messages did exist but Nandleen, LLC and its driver Reginald James about the details and nature of this

15

trip. Nandleen, LLC destroyed these messages and failed to produce them. This Court should enter an order providing for an instruction that the jury must presume the information that was contained in the text messages was unfavorable to Nandleen, LLC.

Respectfully submitted,

**THE LAW FIRM FOR TRUCK SAFETY, LLP**

*s/Matthew E. Wright*
Matthew E. Wright, #022596
840 Crescent Centre Drive
Suite 310
Franklin, TN 37067
P: (615) 455-3588
F: (615) 468-4540
matt@truckaccidents.com
*Attorney for Plaintiff,*
*Grant Hamrick*

# CERTIFICATE OF SERVICE

I, Matthew E. Wright, hereby certify that a copy of the foregoing has been furnished via the Court's ECF filing system to the following:

Brad A Fraser
Ethan D. Lavelle
LEITNER, WILLIAMS, DOOLEY
  & NAPOLITAN, PLLC
900 South Gay Street
Suite 1800
Knoxville, TN 37902
*Attorneys for Defendants Splash*
*Transport, Inc. and Ahmed Elmehalawy*

Kenneth W. Ward
Ryan Sarr
TRAMMEL, ADKINS & WARD, PC
1900 N. Winston Road
Suite 600
Knoxville, TN 37919
*Attorney for Nandleen, LLC d/b/a Nandleen*
*Logistics, LLC and Reginald Devon James*

on November 12, 2021.

*s/Matthew E. Wright*
Matthew E. Wright

17

Case 3:20-cv-00417-TRM-DCP   Document 91   Filed 11/12/21   Page 17 of 17   PageID #: 643